**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | |
|---|---|
| COMMON GROUND HEALTHCARE COOPERATIVE, | |
| Plaintiff, on behalf of itself and all others similarly situated, | No.  1:17-cv-00877-MMS (Judge Sweeney) |
| vs. | |
| THE UNITED STATES OF AMERICA, | |
| Defendant. | |

**CLASS COUNSEL'S MOTION FOR APPROVAL OF ATTORNEY'S FEE REQUEST AND CLASS REPRESENTATIVE INCENTIVE AWARD**

# TABLE OF CONTENTS

**Page**

I.     INTRODUCTION .................................................................................................1

II.    BACKGROUND ..................................................................................................2

    A.    Quinn Emanuel Identifies and Brings the First Risk Corridors Claims in the Nation ....................................................................................................2

    B.    QHP Issuers Vote With Their Feet By Choosing Quinn Emanuel as the Highest-Quality, Most Cost Effective Counsel Available .......................................4

    C.    Quinn Emanuel Provided Substantial Assistance on Appeal to Parallel Risk Corridors Plaintiffs, Even Though the Court Stayed This Case .....................6

III.    ARGUMENT ......................................................................................................8

    A.    Quality of Class Counsel is Exceptional ..................................................................9

    B.    The Risk Corridors Cases Were Complex, Lengthy, and Vigorously Litigated ..................................................................................................................14

    C.    There Was a Substantial Risk of Nonrecovery ......................................................17

    D.    Contingency Fees Far in Excess of 5% Are Regularly Negotiated in Similar Cases ..........................................................................................................20

    E.    Class Members Were on Notice of Counsel's Likely Fee Request Before They Opted In ........................................................................................................23

    F.    The Percentage Sought is Far Less Than in Comparable Cases ............................25

    G.    Size of Award ........................................................................................................27

    H.    A "Lodestar Cross-Check" Confirms Quinn Emanuel's Requested Fees Are Reasonable .....................................................................................................28

        1.    A lodestar cross-check is an additional tool used to assess the reasonableness of class counsel fee requests ............................................28

        2.    Quinn Emanuel's requested fees are within well-accepted ranges for lodestar multipliers for results such as these .......................................30

IV.    THE CLASS REPRESENTATIVES SHOULD RECEIVE INCENTIVE AWARDS .........................................................................................................32

V.    CONCLUSION ..................................................................................................33

# TABLE OF AUTHORITIES

**Page**

## Cases

*Acevedo v. Brightview Landscapes, LLC*,
  No. CV 3:13-2529, 2017 WL 4354809 (M.D. Pa. Oct. 2, 2017)........................................ 21, 22

*Alaska Elec. Pension Fund v. Bank of Am. Corp.*,
  No. 14-CV-7126(JMF), 2018 WL 6250657 (S.D.N.Y. Nov. 29, 2018).................................. 9

*Americas Mining Corp. v. Theriault*,
  51 A.3d 1213 (Del. 2012) ...................................................................................................... 30

*Beckman v. KeyBank, N.A.*,
  293 F.R.D. 467 (S.D.N.Y 2013) ............................................................................................ 31

*Bishop v. United States*,
  No. 10-594L, 2013 WL 4505991 (Fed. Cl. Aug. 19, 2013) ............................................. 16, 17

*Blue Cross and Blue Shield of North Carolina v. United States*,
  131 Fed. Cl. 457 (2017) .................................................................................................... 13, 19

*Boeing Co. v. Van Gemert*,
  444 U.S. 472 (1980).................................................................................................................. 8

*In re Citigroup Inc. Bond Litig.*,
  988 F. Supp. 2d 371 (S.D.N.Y. 2013)..................................................................................... 10

*In re Enron Corp. Securities, Derivative & ERISA Litigation*,
  586 F. Supp. 2d 732 (S.D. Tex. 2008) ............................................................................... 26, 31

*In re Facebook, Inc., IPO Sec. & Derivative Litig.*,
  343 F. Supp. 3d 394 (S.D.N.Y. 2018)..................................................................................... 16

*Geneva Rock Prods, Inc. v. United States*
  119 Fed. Cl. 581  (2015)  ................................................................................................... 29, 30

*Haggart v. Woodley*,
  809 F.3d 1336 (Fed. Cir. 2016)........................................................................................... 28, 29

*Health Republic Ins. Co. v. United States*,
  129 Fed. Cl. 757 (2017) ................................................................................................... passim

*In re Ins. Brokerage Antitrust Litig.*,
  282 F.R.D. 92 (D.N.J. 2012).................................................................................................... 21

*Kane Cty., Utah v. United States*,
145 Fed. Cl. 15 (2019) ................................................................ passim

*La. Wholesale Drug Co., Inc. v. Bristol-Myers Squibb Co.*,
01-cv-7951, Dkt. 22  (S.D.N.Y. Apr. 11, 2003) ................................ 26

*Lambert v. United States*,
124 Fed. Cl. 675 (2015) ............................................................ 9, 28

*Land of Lincoln Mutual Health Insurance Co. v. United States*,
129 Fed. Cl. 81 (2016) ....................................................... 13, 14, 19

*Longnecker Prop. v. United States*,
No. 2015-5045, 2016 WL 9445914 (Fed. Cir. Nov. 14, 2016) ........... 24, 30

*Maine Cmty. Health Options v. United States*,
140 S. Ct. 1308 (2020) .............................................................. passim

*Maine Community Health Options v. United States*,
133 Fed. Cl. 1 (2017) ............................................................... 13, 19

*In re Merry-Go-Round Enters., Inc.*,
244 B.R. 327 (D. Md. 2000) ............................................................ 31

*Minuteman Health, Inc. v. United States Dep't of Health & Human Servs.*,
291 F. Supp. 3d 174 (D. Mass. 2018) ............................................... 15

*Moda Health Plan, Inc. v. United States*,
892 F.3d 1311 (Fed. Cir. 2018).......................................................... 19

*Moda Health Plan, Inc. v. United States*,
908 F.3d 738 (Fed. Cir. 2018)......................................................... 7, 14

*Moore v. United States*,
63 Fed. Cl. 781 (2005) ....................................................... 9, 17, 18, 20

*In re NASDAQ Market-Makers Antitrust Litigation*,
187 F.R.D. 465 (S.D.N.Y. 1998) ....................................................... 26

*In re Neurontin Antitrust Litig.*,
2:02-cv-01830, Dkt. 114 (D.N.J. Aug. 6, 2014) ................................... 25

*In re Nigeria Charter Flights Litig.*,
No. 04-CV-304, 2011 WL 7945548 (E.D.N.Y. Aug. 25, 2011).............. 10

*Nilsen v. York Cty.*,
400 F. Supp. 2d 266 (D. Me. 2005) ......................................... 22, 29, 30

*In re Payment Card Interchange Fee and Merchant Discount Antitrust Litig.*,
  No. 1:05-md-01720, Dkt. 6169 (E.D.N.Y. Jan. 10, 2014).....................................................33

*In re Payment Card Interchange Fee and Merchant Discount Antitrust Litigation*,
  991 F. Supp. 2d 437 (E.D.N.Y. 2014) ............................................................................ passim

*In re Prandin Direct Purchaser Antitrust Litig.*,
  No. 2:10-CV-12141-AC-DAS, 2015 WL 1396473 (E.D. Mich. Jan. 20, 2015) ....................33

*Quimby v. United States*,
  107 Fed. Cl. 126 (2012) ............................................................................................... passim

*Raulerson v. United States*,
  108 Fed. Cl. 675 (2013) ............................................................................................... passim

*In re Relafen Antitrust Litig.*,
  01-12239-WHY, Dkt. 297 at 7-8 (D. Mass. 2004) ...............................................................25

*In re Rite Aid Corp. Secs. Litig.*,
  396 F.3d 294 (3rd Cir. 2005) ................................................................................................30

*Russell v. United States*,
  132 Fed. Cl. 361 (2017) ........................................................................................................32

*In re Schering-Plough Corp. Enhance Sec. Litig.*,
  No. CIV.A. 08-2177 DMC, 2013 WL 5505744 (D.N.J. Oct. 1, 2013) ....................................9

*Shane Grp., Inc. v. Blue Cross Blue Shield of Mich.*,
  No. 10-CV-14360, 2015 WL 1498888  (E.D. Mich. Mar. 31, 2015) .........................................33

*In re Skelaxin*,
  12-md-2343, Dkt. 747 (E.D. Tenn. June 30, 2014) ...............................................................25

*In re Southern Peru Copper Corp.*,
  No. CIV.A. 961-CS, 2011 WL 6382006 (Del. Ch. Dec. 20, 2011)..................................26, 28

*Stop & Shop Supermarket Co. v. SmithKline Beecham Corp.*,
  No. 03-civ-04578, 2005 WL 1213926 (E.D. Penn. May 19, 2005)........................................31

*In re Subway Footlong Sandwich Mktg. & Sales Practices Litig.*,
  869 F.3d 551 (7th Cir. 2017) ................................................................................................23

*In re Synthroid Mktg. Litig.*,
  264 F.3d 712 (7th Cir. 2001) ...........................................................................................20, 22

*Thomas v. United States*,
  121 Fed. Cl. 524 (2015) ........................................................................................................24

*In re Trans Union Corp. Privacy Litig.*,
No. 00 C 4729, 2009 WL 4799954 (N.D. Ill. Dec. 9, 2009) .................................................. 22

*In re Tricor Direct Purchaser Antitrust Litig.*,
05-340-SLR, Dkt. 543 at 8-10 (D. Del. Apr. 23, 2009).......................................................... 25

*In re Tyco Int'l, Ltd. Multidistrict Litig.*,
535 F. Supp. 2d 249 (D.N.H. 2007).................................................................................. 26, 28

*In re Visa Check/Mastermoney Antitrust Litigation*,
297 F. Supp. 2d 503 (E.D.N.Y. 2003) .............................................................................. 26, 27

*In re Vitamin C Antitrust Litig.*,
No. 06-MD-1738 BMC JO, 2012 WL 5289514 (E.D.N.Y. Oct. 23, 2012) ........................... 33

*Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*,
396 F.3d 96 (2d Cir. 2005)................................................................................................ 29

*In re WorldCom, Inc. Secs. Litig.*,
388 F. Supp. 2d 319 (S.D.N.Y. 2005)................................................................................ 31

## <u>Treatises</u>

5 *Newberg on Class Actions*, § 13:54 (Rubenstein ed., 5th ed. 2020)........................................... 8

5 *Newberg on Class Actions*, § 15:67 (Rubenstein ed., 5th ed. 2020)............................ 28, 30, 31

*Fed. Prac. & Proc. Civ.*, § 1803.1 (Wright and Miller, 3d ed. 2020).......................................... 29

## <u>Other Authorities</u>

Manual for Complex Litig. (4th ed.) § 14.121 (2004) .................................................................. 9

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | |
|---|---|
| COMMON GROUND HEALTHCARE COOPERATIVE, | |
|    Plaintiff,<br>   on behalf of itself and all others<br>   similarly situated, | No.  1:17-cv-00877-MMS<br>(Judge Sweeney) |
|  vs. | |
| THE UNITED STATES OF AMERICA, | |
|    Defendant. | |

**CLASS COUNSEL'S MOTION FOR APPROVAL OF ATTORNEY'S FEE REQUEST AND CLASS REPRESENTATIVE INCENTIVE AWARD**

## I. <u>INTRODUCTION</u>

In February 2016, Quinn Emanuel became the first firm in the nation to file a lawsuit on behalf of a Qualified Health Plan issuer against the federal government alleging that the government improperly failed to make risk corridor payments in violation of Section 1342 of the Affordable Care Act.  Four years later, following round after round of fierce litigation and a loss at the Federal Circuit, eight justices of the Supreme Court adopted the exact legal theory Quinn Emanuel set forth in the initial *Health Republic* complaint and which it advocated at every step, including in the parallel cases that eventually made their way to the Supreme Court.  The result? An entire industry was able to collect three years' worth of unpaid risk corridors amounts they had previously been forced to write off as a total loss—approximately $12 billion.  Nearly $4 billion of that recovery will go to the class members in these class actions.

For its work on behalf of the class members, Quinn Emanuel seeks 5% of the class judgments as its attorneys' fee. This is the amount to which Quinn Emanuel limited itself in the class opt-in notice and, as discussed at length below, respectfully believes is warranted by the work

it has performed in these class actions (and beyond), the results it has achieved for the class members, and the law guiding the Court's analysis.  If approved, a 5% fee would represent one of the lowest percentage rates ever awarded to class counsel, even in cases with multi-billion-dollar recoveries, such as this.

As support for this petition, Quinn Emanuel cites extensively to the records in the various cases and appeals, and submits the declarations of Prof. Brian Fitzpatrick (Ex. 2) and Prof. Charles Silver (Ex. 3), noted civil procedure and class action scholars, who provide further empirical and economic support for counsel's fee request.

Finally, given their extensive efforts and doggedness on behalf of the respective classes, Quinn Emanuel also seeks permission to provide both Health Republic and Common Ground $100,000 class representative incentive fees.  Quinn Emanuel proposes paying these fees out of its fee award, meaning that the incentive fees will not cost the other class members anything extra.

## II.  BACKGROUND

### A.  Quinn Emanuel Identifies and Brings the First Risk Corridors Claims in the Nation

In late 2015, Quinn Emanuel partners Stephen Swedlow, J.D. Horton, and Adam Wolfson learned about the federal government's decision to not fund the risk corridors program in accordance with Section 1342's money-mandating provisions.  They read news stories about the widespread chaos the multi-billion shortfall in payments caused and, believing that the decision reflected a serious injustice, researched the legal options available to qualified health plan issuers. Based on this research, they concluded that QHP issuers did, in fact, possess Tucker Act claims against the government for the full amount of outstanding risk corridors payments.

In January 2016, Quinn Emanuel spoke with Dawn Bonder, the CEO of Health Republic Insurance Company, an Oregon-based CO-OP that had suffered heavily due to the government's

failure to make full risk corridor payments for 2014—so much so that it had to wind down its operations following the 2015 benefit year.   Declaration of Dawn Bonder ("Bonder Dec.") ¶¶ 8-9 (Ex. 4).  Ms. Bonder had previously spoken with news outlets regarding her frustrations with the government's actions and, with the consent of her co-executives and Board of Directors, retained Quinn Emanuel to represent Health Republic as a representative for a putative class of QHP issuers who suffered similarly from the government's failure to pay.  *Id.* ¶ 10.

Health Republic and Quinn Emanuel took a substantial risk in suing the government on the risk corridors claims.  Shortly before filing the complaint, Ms. Bonder spoke with Robert Gootee, the CEO of Moda Health Plan, another insurer based in Oregon (and one of the QHP issuers that took their later-filed risk corridors claims to the Supreme Court).  *Id.*  Ms. Bonder explained the nature of Health Republic's upcoming lawsuit and Mr. Gootee responded by telling her she was making a "bold" choice in filing suit, and that he would not even consider doing so on behalf of Moda, as he thought the lawsuit had no chance of success.  *Id.*

Nevertheless, in late February, Quinn Emanuel filed a first-of-its-kind lawsuit, asserting Health Republic's and the putative risk corridors class's Tucker Act claims. *Id.* ¶ 12; Declaration of Stephen Swedlow ("Swedlow Dec.")  ¶ 8 (Ex. 1).  The lawsuit alleged a cause of action for failure to satisfy Section 1342's money-mandating obligation--a liability and damages theory this Court and, more recently, the Supreme Court validated in full.  *See Health Republic* Compl. (Dkt. 1); *Maine Cmty. Health Options v. United States*, 140 S. Ct. 1308, 1331 (2020).  Quinn Emanuel focused solely on the statutory claim and did not waste class resources on breach of contract or takings claims it believed were superfluous to the core wrong.  Quinn Emanuel's complaint then proceeded for several months as the sole complaint in the nation, until other QHP issuers filed suit

using the Health Republic complaint as a template for their claims.  Bonder Dec. ¶ 12; Swedlow Dec. ¶¶ 11-12.

**B.**     **QHP Issuers Vote With Their Feet By Choosing Quinn Emanuel as the Highest-Quality, Most Cost Effective Counsel Available**

In the months following the initial filing, Quinn Emanuel met and conferred with the government, scheduled briefing on the government's intended motion to dismiss, undertook substantial legal and factual research, and then briefed that motion in full.  The briefs Quinn Emanuel submitted during this process, as well as this Court's subsequent denial of the government's motion to dismiss, were pathbreaking.  The Court's opinion denying the government's motion to dismiss, as well as the arguments Quinn Emanuel raised on Health Republic's and the putative class's behalf, thereafter became a blueprint for subsequent lawsuits and Court of Federal Claims decisions that then went up on appeal to the Federal Circuit and, eventually, the Supreme Court.

After defeating the government's motion to dismiss, Quinn Emanuel convinced the government to agree to class certification and thereafter began the long and arduous process of providing notice to all of the putative class members and, because this is an opt-in class action, meeting with and discussing the case with potential class members and answering their questions about the claims (including, *inter alia*, the reasons to join the class). *See Health Republic* Dkt. 30; Swedlow Dec. ¶ 11.  A huge number of these QHP issuers chose to do exactly that, because Quinn Emanuel offered them the best combination of cost-effective, high quality of counsel.   Swedlow Dec. ¶ 17.

To the latter point, during the opt-in period, it became clear that some QHP issuers who had not spoken with Quinn Emanuel (along with outside counsel at other firms) had concluded that Quinn Emanuel would seek 33% of any settlement or award.  Swedlow Dec. ¶ 13.  As a result

of this incorrect assumption, several QHP issuers retained counsel to file individual lawsuits in the Court of Federal Claims at contingency rates in multiples of the 5% Quinn Emanuel is seeking in this fee petition. *Id*. ¶ 14. On the day Quinn Emanuel learned of the misunderstanding related to the anticipated contingency rate, it submitted (and the Court subsequently approved) a supplemental class notice informing potential class members that Quinn Emanuel would seek attorneys' fees of no greater than 5% of any recovery. *Id*. ¶ 15. This supplemental notice was sent to every putative class member before the deadline to opt in, so all eventual class members joined the class with this information in hand. *Id*. Quinn Emanuel subsequently learned from QHP issuers that, after it made the 5% maximum fee disclosure, other law firms willing to represent QHP issuers on a contingent basis were unwilling to agree to rates that low. *Id*. ¶ 16. As a consequence, after the supplemental notice, some QHP issuers chose to opt into the class because Quinn Emanuel's offered fee rate was the lowest they were able to obtain. *Id*.

Eventually, more than 150 QHP issuers representing more than $2.1 billion in unpaid risk corridors amounts for the 2014 and 2015 benefit years opted into the class. *Id*. ¶ 17. During the opt-in process, Quinn Emanuel also moved for summary judgment on the putative class's claims. *See Health Republic* Dkt. 47. The government filed a cross-motion for summary judgment and the parties briefed those issues to the Court in early- and mid-2017. On the putative class's behalf, Quinn Emanuel retained an expert economist, who helped explain the economic incentives underlying the risk corridors program, as well as the problems associated with failure to pay. See Swedlow Dec. ¶ 24; *Health Republic* Dkt. 47-1. Quinn Emanuel presented arguments that the Supreme Court later adopted, using reasoning and citations virtually identical to those that Quinn Emanuel provided in its original summary judgment briefs.

Shortly after briefing on those cross-motions was complete, Quinn Emanuel also filed a putative class action for 2016 benefit year risk corridor amounts. This came about because, during the opt-in process for the *Health Republic* action, Quinn Emanuel spoke with Common Ground Healthcare Cooperative, another CO-OP that faced substantial headwinds due to the government's failure to pay risk corridors amounts. Declaration of Cathy Mahaffey ("Mahaffey Dec.") ¶ 6 (Ex. 5). Because Health Republic wound down its operations following the 2015 benefit year, it could not act as a class representative for QHP issuers who provided QHPs in the 2016 year. Bonder Dec. ¶ 8. Common Ground, however, did provide QHPs that year and expressed interest in picking up where Health Republic left off, acting as a class representative for QHP issuers on 2016 risk corridor amounts. Mahaffey Dec. ¶¶ 4, 6.

C. **Quinn Emanuel Provided Substantial Assistance on Appeal to Parallel Risk Corridors Plaintiffs, Even Though the Court Stayed This Case**

Well after this case was filed, several other QHP issuers also filed suit. Those cases moved more quickly than this case because they were not class actions and therefore could proceed directly to summary judgment, whereas this case needed to first go through class certification and then the opt-in process before the Court could decide summary judgment. Due to the speed with which those other cases proceeded, they reached the judgment phase—with mixed success for the plaintiffs—before this Court could rule on Health Republic's summary judgment motion. This Court therefore stayed consideration of the summary judgment motion pending the final resolution of those later-filed, but earlier-decided, single actions. *See Health Republic* Dkt. 62. The Court also stayed consideration of the merits of the risk corridor claim in *Common Ground*. *Common Ground* Dkt. 9.

Quinn Emanuel, however, did not remain idle in the years following the stays. In the Federal Circuit, Quinn Emanuel submitted multiple amicus briefs on behalf of different interested

parties, including Health Republic, a trade association named America's Health Insurance Plans, and a group of health economists from across the political spectrum that explained how the government would hamper itself in the future with respect to public-private enterprise if it did not make good on its statutory promises to pay. Swedlow Dec. ¶ 22. The economists' amicus brief had particular impact during the appeal process; Judge Wallach cited it extensively in dissenting from the denial of *en banc* review. *See Moda Health Plan, Inc. v. United States*, 908 F.3d 738, 747-48 (Fed. Cir. 2018) (Wallach, J., dissenting from denial of *en banc* rehearing)

At the Supreme Court level, Quinn Emanuel continued providing critical input, again submitting amicus briefs on behalf of the economist group, including in connection with the plaintiffs' petition for a writ of certiorari, as well as during the merits briefing before the Supreme Court. Swedlow Dec. ¶ 22. The submissions focused on the negative economic and societal impact that would result if the government failed to honor its commitments. The reasoning reflected in Quinn Emanuel's amicus briefs self-evidently made its way into the Supreme Court's subsequent opinion. As Justice Sotomayor's majority opinion noted, the Court's holdings in *Maine Community Health Options* "reflect a principle as old as the Nation itself: The Government should honor its obligations." *Maine Cmty. Health Options v. United States*, 140 S. Ct. 1308, 1331 (2020).

Throughout the Supreme Court process, Quinn Emanuel also provided comments, strategic suggestions, and assistance with argument to the firms and attorneys handling the Supreme Court arguments. Swedlow Dec. ¶ 22. All that work paid off for the class in the Supreme Court's eventual decision, and now all class members will be able to collect 100% of their remaining unpaid risk corridors amounts. For the Non-Dispute Subclasses, this amounts to approximately

$1.9 billion *Health Republic* and $1.8 billion in *Common Ground*.  *See Health Republic* Dkt. 82;

*Common Ground* Dkt. 105.

### III.   <u>ARGUMENT</u>

Most class actions do not proceed to final judgment; instead, they typically resolve through

settlement.  Fitzpatrick Dec. ¶ 3.  Because settlements do not provide class members full relief,

courts are charged with protecting class members' interests by ensuring that such results are "fair,

reasonable and adequate."  RCFC 23(e)(2); Fitzpatrick Dec. ¶ 9.  In assessing the attorneys' fees

class counsel requests as part of a settlement, courts are further charged with asking whether there

has been "a tradeoff between merits relief and attorney's fees."  5 Newberg on Class Actions §

13:54 (William Rubenstein ed., 5th ed. 2020) (collecting cases).

In contrast, where, as here, class counsel obtains a judgment for the class that affords each

class member full relief, the attorney fee inquiry is narrower.  The Court must decide only whether

proposed fees are "reasonable" under the circumstances.  *Compare* RCFC 23(h), *with* RCFC

23(e)(2)(C).  Class members must of course receive notice of and be afforded the opportunity to

respond to the fee request, but the Court need not hold a hearing on the issue, as it must for a

settlement.  *Compare* RCFC 23(h)(3), *with* RCFC 23(e)(2)(C).

The recovery in this case takes the form of a "common fund," meaning that "each member

of a certified class has an undisputed and mathematically ascertainable claim to part of a lump-

sum judgment recovered on his behalf."  *Kane Cty., Utah v. United States*, 145 Fed. Cl. 15, 18

(2019) (citing *Boeing Co. v. Van Gemert*, 444 U.S. 472, 479 (1980)).  Where such a common fund

has been created to benefit an RCFC 23 class, but some or most class members have no bilateral

contractual agreement with class counsel regarding fees, "it is appropriate to direct an award of

attorney fees and expenses based on the common fund doctrine so that the other plaintiffs pay their

fair share of the costs of class counsel's advocacy on their behalf."  *Id.*

To "determin[e] the appropriate percentage for recovery of fees from a common fund," judges of this court evaluate a proposed percentage fee award based on seven factors:  "(1) the quality of counsel; (2) the complexity and duration of litigation; (3) the risk of non-recovery; (4) the fee that likely would have been negotiated between private parties in similar cases; (5) any class member's objections to the settlement terms or fees requested by class counsel; (6) the percentage applied in other class actions; and (7) the size of the award." *Lambert v. United States*, 124 Fed. Cl. 675, 683 (2015); *see also Kane Cty.*, 145 Fed. Cl at 18; *Raulerson v. United States*, 108 Fed. Cl. 675, 679–80 (2013); *Quimby v. United States*, 107 Fed. Cl. 126, 133 (2012); *Moore v. United States*, 63 Fed. Cl. 781, 787 (2005) (citing Manual for Complex Litig. (4th ed.) § 14.121 (2004)).

These factors, taken individually and in the aggregate, strongly support Quinn Emanuel's request for an award of 5% of the common fund created for the Non-Dispute Subclasses in these cases.

A. <u>**Quality of Class Counsel is Exceptional**</u>

Among the factors relevant to the quality of counsel are "the difficulties faced, the speed and efficiency of the recovery, the standing, experience and expertise of the counsel, the skill and professionalism with which counsel prosecuted the case and the performance and quality of opposing counsel." *In re Schering-Plough Corp. Enhance Sec. Litig.*, No. CIV.A. 08-2177 DMC, 2013 WL 5505744, at *25 (D.N.J. Oct. 1, 2013).  But the quality of counsel's representation is "best measured by results." *Alaska Elec. Pension Fund v. Bank of Am. Corp.*, No. 14-CV-7126 (JMF), 2018 WL 6250657, at *1 (S.D.N.Y. Nov. 29, 2018).  And here, class counsel achieved truly superlative results:  a 100% recovery for each and every class member.  Indeed, courts regularly find that counsel achieved exceptional results for the class where counsel obtained *less than half* of the class's potential recovery.  *See, e.g., Alaska Elec.*, 2018 WL 6250657, at *1

(holding that quality of representation "was exceptional" because counsel recovered "between 35% and 73% of their expected trial demand"); *In re Citigroup Inc. Bond Litig.*, 988 F. Supp. 2d 371, 379 (S.D.N.Y. 2013) (results favored a "substantial award" of attorney's fees although "the recovery here--\$730 million—represents only a fraction of the possible recovery estimated by plaintiffs' damages experts--\$3 billion); *In re Nigeria Charter Flights Litig.*, No. 04-CV-304, 2011 WL 7945548, at *8 (E.D.N.Y. Aug. 25, 2011) (counsel's representation was "of high quality" where counsel achieved an approximately 48% recovery).

The exceptional result in this case was a direct result of counsel's exceptional skill. Quinn Emanuel is a world-renowned litigation firm, having been described as a "global force in business litigation" by the *Wall Street Journal* and a "litigation powerhouse" by *The American Lawyer*. Swedlow Dec. ¶ 2. Legal Business has three times recognized Quinn Emanuel as a "US Law Firm of the Year," and in 2015 and 2019 The American Lawyer named the firm as a "Litigation Department of the Year" finalist. *Id.* In 2013 and 2016, Quinn Emanuel was named the "Class Action Practice Group of the Year" by Law360 for its work for plaintiffs and defendants in class action litigation. *Id.* ¶ 4. And in 2020, Quinn Emanuel was voted the "most feared" firm in the world after independent BTI Consulting Group surveyed over 350 major companies who identified Quinn Emanuel as the firm they least wanted to face as opposing counsel. *Id.* ¶ 2. In short, Quinn Emanuel's reputation among firms that practice complex litigation is unparalleled. *See also Kane Cty.,* 145 Fed. Cl. at 18–19 (quality of counsel factor weighed in favor of significant attorney's fee award where counsel had "extensive experience" in issues underlying the case).

Likewise, the individual attorneys representing the class have extensive experience in class action and healthcare litigation along with stellar reputations. Lead class counsel Stephen Swedlow, Managing Partner of Quinn Emanuel's Chicago Office, has been lead counsel in over

20 trials, multi-party jury trials and arbitrations.  Swedlow Dec. ¶ 5.  He has been lead trial counsel for two class action trials to verdict and has obtained, as lead counsel, class action settlements of $63 million and $100 million in cases involving health plans.  *Id*.  In 2003, he was a finalist for Trial Lawyer of the Year for obtaining the largest civil verdict in Illinois history.  *Id*.

J.D. Horton, a partner in Quinn Emanuel's Los Angeles office, has represented health plans in civil and regulatory actions for over 20 years.  *Id*. ¶ 6.  He has obtained settlements of $40 million and $28 million on behalf of two health plan classes related to prescription drug purchases and represented the Kaiser Foundation Health Plan in multiple enforcement proceedings brought by the Department of Managed Health Care, including in a 40-day trial that ended with the Court rejecting virtually the entirety of the Department's case.  *Id*.  Among many other health plan providers, he has represented Blue Shield of California in a declaratory relief action against the Department of Managed Health Care, as well as a major health care service plan in an arbitration against a large IPO.  *Id*.

Adam Wolfson, also a partner in Quinn Emanuel's Los Angeles office, was one of the principal co-lead counsel for plaintiffs in In re Polyurethane Foam Antitrust Litigation, where he helped obtain more than $430 million in settlements on behalf of a certified class in a case alleging a price-fixing conspiracy in the flexible polyurethane foam industry.  *Id*. ¶ 7. He also obtained a $283 million patent infringement and breach of contract trial verdict on behalf of ViaSat, Inc. relating to its competitor's theft of innovative intellectual property and satellite designs.  *Id*. He is currently on the plaintiffs' Executive Committee in *In re Combat Arms Earplug Product Liability Litigation*, in which the plaintiffs, service members from all branches of the U.S. Armed Forces, are suing to recover for damages they suffered from the use of defective earplugs 3M sold to the USAF for over a decade, and he is currently representing a putative class of consumers harmed by

supracompetitive ATM fees set by collusion amongst Visa, MasterCard, and their constituent bank investors. *Id.* In 2019, he was named a Rising Star in Class Actions by the national legal journal, *Law360*.

The performance of the Quinn Emanuel lawyers in this case is emblematic of their pedigree. In February 2016, Quinn Emanuel became the first firm in the nation to pursue a risk corridors action when it filed *Health Republic*. It was not until June 2016, when Moda Health filed its complaint, that QHP issuers started to bring individual actions mirroring Quinn Emanuel's earlier work. The pioneering *Health Republic* complaint pleaded a single claim on behalf of a putative 2014/2015 risk corridors class: violation of the government's statutory obligation to make payments under Section 1342 of the Affordable Care Act and its implementing regulations, for which the class could recover pursuant to the Tucker Act. *Health Republic* Compl. ¶¶ 59-63 (Dkt. 1). This legal theory is the exact one eight Justices of the United States Supreme Court eventually vindicated after more than four years of contentious litigation. *See Maine Community Health Options*, 140 S. Ct. 1308. While other QHP issuers also pursued implied contract or takings claims (in addition to adopting the statutory claim Quinn Emanuel alleged on the putative class's behalf), Quinn Emanuel identified and focused exclusively on what became the winning legal theory from the outset. That Quinn Emanuel did so is a testament to its strategic and legal acumen, given that the Supreme Court noted that "so-called money-mandating provisions are uncommon . . . because Congress has at its disposal several blueprints for conditioning and limiting obligations." *Id.* at. 1329. It was Quinn Emanuel that first recognized that the "Risk Corridors statute is one of the rare laws permitting a damages suit in the Court of Federal Claims." *Id.*

After Quinn Emanuel laid out a viable path to recovery for QHP issuers via the *Health Republic* complaint, several other firms began aggressively seeking out QHP issuers to file

individual lawsuits. Nevertheless, when it came time to opt in to the classes in the *Health Republic* and *Common Ground* cases, hundreds of QHP issuers chose Quinn Emanuel as their counsel. With many options for counsel available—on both a contingency and hourly basis—QHP issuers holding approximately one-third of the total value of all risk corridor claims joined the classes in these cases, demonstrating their (justified) confidence in Quinn Emanuel as class counsel. Swedlow Dec. ¶ 17. As part of this process, many QHP insurers had detailed questions about their rights against the government. Quinn Emanuel advised on all such questions, to the extent they fell under its role as class counsel, and it similarly provided input to individual litigants that chose not to join the class, because Quinn Emanuel recognized that, even if it did not have a tangible stake in the parallel individual lawsuits, assisting those plaintiffs on virtually identical claims benefited the classes here. Swedlow Dec. ¶ 9.

Quinn Emanuel did not let the classes down. Even as a majority of the Court of Federal Claims judges who ruled on risk corridors cases dismissed QHP issuers' claims or granted summary judgment for the government, this Court, after carefully considering Quinn Emanuel's briefs and arguments, rejected the government's effort to dismiss Health Republic's claim; a position the Supreme Court subsequently validated. *Compare Health Republic Ins. Co. v. United States*, 129 Fed. Cl. 757 (2017), *with Maine Community Health Options v. United States*, 133 Fed. Cl. 1 (2017) (Bruggink, J.); *Blue Cross and Blue Shield of North Carolina v. United States*, 131 Fed. Cl. 457 (2017) (Griggsby, J.); and *Land of Lincoln Mutual Health Insurance Co. v. United States*, 129 Fed. Cl. 81 (2016) (Lettow, J.). When follow-on cases adopting Quinn Emanuel's theory arrived at the Federal Circuit, Quinn Emanuel did not stand idly by: among other things, Quinn Emanuel hired Professor M. Kate Bundorf, a healthcare economist, as an expert, and submitted four amicus briefs to the Federal Circuit, two of which were extensively cited in Judge

Wallach's dissent from denial of *en banc* rehearing. *See Moda Health Plan, Inc. v. United States*, 908 F.3d 738, 747-48 (Fed. Cir. 2018) (Wallach, J., dissenting from denial of *en banc* rehearing) (citing amicus briefs of Bundorf et al. and Health Republic/Common Ground). Judge Wallach, joined by Judge Newman, specifically focused on Quinn Emanuel's amicus brief on behalf of Prof. Bundorf and a consortium of health economists, which warned of the dangers of the government's failure to act as an honest broker and honor its commitments to insurers. *Id*. Quinn Emanuel likewise represented the economists as amici at both the certiorari and merits stage at the Supreme Court. These submissions focused on the negative economic and societal impact that would result if the government failed to honor its commitments. When the Court issued its decision adopting Quinn Emanuel's position, it stressed the importance of having a government that honors its obligations. *Maine Community Health Options*, 140 S. Ct. at 1331.

In short, in February 2016, Quinn Emanuel identified and developed legal claims that an entire industry imitated, and which nearly one-third of that industry chose to support by selecting Quinn Emanuel as their counsel. Quinn Emanuel then aggressively litigated that legal theory— over the vehement and skilled opposition of the government—until it was vindicated by a near-unanimous Supreme Court. The result of Quinn Emanuel's stellar performance is not only a nearly $4 billion, 100% recovery for its two classes—it is a $12 billion, 100% industrywide recovery. Rare is the case where class counsel's skillful strategy and execution produces such far-reaching benefits. Quinn Emanuel's performance as class counsel more than justifies its requested fee award.

> **B.** **The Risk Corridors Cases Were Complex, Lengthy, and Vigorously Litigated**

Quinn Emanuel filed *Health Republic* nearly four and a half years ago and has been aggressively litigating it (and *Common Ground*) ever since. When Quinn Emanuel filed *Health Republic*, its legal theory was novel and untested—Health Republic was the first QHP issuer to

file suit, and, as of February 2016, not a single case had interpreted or even cited to Section 1342 of the Affordable Care Act.  One of the central questions in these cases—whether the risk corridors statute is "money-mandating"—concerned an area of law with little binding precedent; as Justice Sotomayor's majority opinion in *Maine Community Health Options* noted, "[r]arely has the Court determined whether a statute can fairly be interpreted as mandating compensation by the Federal Government."  140 S. Ct. at 1329 (internal quotation marks omitted).  Quinn Emanuel painted on a nearly blank canvas in filing *Health Republic*.  *See Quimby*, 107 Fed. Cl. at 133 (approving class counsel's fee request in part due to "the absence of controlling precedent" on merits issues).

Nor were the legal questions in this case easy.  The Affordable Care Act "is a notoriously complex statute, health insurance is notoriously difficult to administer effectively, and the federal health-care bureaucracy is notoriously cumbersome."  *Minuteman Health, Inc. v. United States Dep't of Health & Human Servs.*, 291 F. Supp. 3d 174, 179 (D. Mass. 2018).  This complexity is reflected in the judiciary's fractured opinions regarding the Act, and specifically Section 1342: multiple judges of the Court of Federal Claims reached diametrically opposite conclusions regarding the merits of QHP issuers' risk corridors claims; the Federal Circuit issued a 2-1 panel decision in the government's favor; the panel opinion drew multiple dissents from denial of *en banc* rehearing; and the Supreme Court ultimately reversed the Federal Circuit.  At every one of these stages, the government vigorously argued that QHP issuers were not entitled to recover a dime beyond the budget-neutral amounts they had already received.  *Quimby*, 107 Fed. Cl. at 133 (holding that "the government's opposition to the Court's ruling on the merits" weighed in favor of approving class counsel's fee request).  And at every one of these stages, Quinn Emanuel either successfully litigated its position (defeating the government's motion to dismiss in *Health Republic*) or provided invaluable support to other QHP issuers pursuing parallel claims, including

by hiring experts, submitting amicus briefs, and advising counsel.  *See supra* Sec. III.A.  Ultimately, Quinn Emanuel pioneered and navigated difficult and novel legal arguments, to the benefit not only of the classes, but also to QHP issuers industrywide.  *See In re Facebook, Inc., IPO Sec. & Derivative Litig.*, 343 F. Supp. 3d 394, 416–17 (S.D.N.Y. 2018) (holding that the complexity factor favored approval of counsel's fee request because the case presented "unique and difficult issues not only for the parties, but also for the broader investor public").

The complexity of this litigation extended far beyond the legal issues.  Quinn Emanuel was tasked with representing two large classes of sophisticated entities, many of whom had their own counsel through whom Quinn Emanuel communicated regarding the case and with whom Quinn Emanuel discussed class member-specific issues.  Swedlow Dec. ¶¶ 18, 20-21.  Ultimately, 153 QHP issuers joined the *Health Republic* class and 130 QHP issuers joined the *Common Ground* class, representing approximately one-third of the value of all risk corridor claims.  *Id.* ¶ 17; *see also Raulerson*, 108 Fed. Cl. at 680 (holding that complexity favored approving counsel's fee request where the litigation "lasted nearly three years and has involved 260 class members with claims for approximately 300 separate properties"); *Bishop v. United States*, No. 10-594L, 2013 WL 4505991, at *5 (Fed. Cl. Aug. 19, 2013) (finding class counsel's fee arrangement reasonable because the "litigation has lasted three years and has involved 68 class members with complex valuation issues, negotiated by experienced counsel").  Reaching this level of participation was an enormous endeavor.  Class counsel flew across the country to meet with QHP issuers—some of whom became class members, and some of whom did not—and extensively addressed and provided insights regarding the merits of their risk corridors' claims and their litigation options.  Swedlow Dec. ¶ 11.  Class counsel's efforts yielded efficiencies for QHP issuers, the government, and the Court of Federal Claims; indeed, at one point, the government indicated that it would prefer

to administer risk corridor claims through counsel's two class actions, as to conserve the resources of both QHP issuers and the Court of Federal Claims, which otherwise would have had to adjudicate hundreds of additional individual lawsuits. *Id.* ¶ 10.

During the four-plus year pendency of this litigation, Quinn Emanuel fielded often-daily inquiries from class members (and other QHP issuers) about a variety of litigation and ACA-related topics, including (but by no means limited to) the susceptibility of risk corridor claims to government offset, the interaction between this litigation and state insolvency laws, possible settlement of claims, and the timing of any recovery. Swedlow Dec. ¶ 20. Indeed, the sheer magnitude of the government's failure to meet its obligations contributed significantly to the complexity of this matter. Predictably, the government's failure to pay tens or hundreds of millions of dollars that it promised to QHP issuers forced numerous class members into liquidation and brought others to the brink of insolvency. *See* Bonder Dec. ¶ 8; Swedlow Dec. ¶ 21. Quinn Emanuel took steps—for which it was not compensated—to enable class members to leverage their risk corridor claims to obtain financing necessary to stay in business, and regularly consulted with and advised liquidators and state insurance officials. Swedlow Dec. ¶ 21; Mahaffey Dec. ¶ 6. In short, in addition to pioneering the winning legal theory, Quinn Emanuel addressed complex ancillary issues for large and sophisticated entities on a day-to-day basis for four years. The complexity of these matters favors approval of class counsel's fee request. S*ee, e.g., Raulerson*, 108 Fed. Cl. at 680 (holding that "complex valuation issues, one of which necessitated a court ruling" favored approval of fee request); *Moore* , 63 Fed. Cl. at 787 (holding that case's "many procedural complexities" favored substantial fee award).

### C.   There Was a Substantial Risk of Nonrecovery

The Court of Federal Claims has found that the risk of nonrecovery supports a substantial attorney's fee where there was an absence of controlling precedent when the case was filed, *see*

*Moore*, 63 Fed. Cl. at 789; where other, similar suits have been unsuccessful, *see Kane Cty.*, 145 Fed. Cl. at 19; and where the government disputed the plaintiff's key positions, *see Quimby*, 107 Fed. Cl. at 133 .  These circumstances, all of which are all present in *Health Republic* and *Common Ground*, signify the existence of risk above and beyond that present in all contingency fee litigation that counsel will not be reimbursed for thousands of hours of labor and significant expenses[1]—a risk that in and of itself favors approval of class counsel's request.  *Raulerson*, 108 Fed. Cl. at 680 (noting that risk factor weighed in favor of approving counsel's fee request because "all litigation carries risk, and that if plaintiffs had lost, Class Counsel would not have received any reimbursement for the 5,000 hours of labor and $225,000 in costs that they expended over the course of nearly four years.").

This litigation was uniquely risky for class counsel.  At the time Quinn Emanuel filed the first-in-the-nation *Health Republic* case, there was no binding precedent holding that the risk corridors statute is money mandating, nor was there binding precedent that QHP issuers may pursue risk corridor claims under the Tucker Act.  And there was little optimism about risk corridor claims among industry insiders—for instance, Dawn Bonder, CEO of Health Republic, was told by the CEO of Moda (which would eventually become the second QHP issuer to file suit) that she was "bold" to even consider filing an action because there was such a low likelihood of success. Bonder Decl. ¶ 10.

---

[1]  Among its many expenses,  Quinn Emanuel retained M. Kate Bundorf, a renowned healthcare economist, as an expert in this matter, and has taken on the costs of administering these class actions, having paid all costs and expenses associated with class notices and claims administration to JND Legal Administration.  Swedlow Dec. ¶ 24.  In addition, Quinn Emanuel intends to bear the additional costs associated with JND's administration of the judgment amount from the Department of Treasury and subsequent disbursement to the class members.  *Id*.

The CEO's fears proved to be well-founded as the litigation progressed.  While this court adopted Quinn Emanuel's position that the risk corridor statute is money-mandating and that QHP issuers may proceed under the Tucker Act, the majority of the Court of Federal Claims judges who assessed risk corridor cases ruled for the government, holding that QHP issuers were not entitled to recover a dime.  *See Maine Community Health Options v. United States*, 133 Fed. Cl. 1 (2017) (Bruggink, J.); *Blue Cross and Blue Shield of North Carolina v. United States*, 131 Fed. Cl. 457 (2017) (Griggsby, J.); *Land of Lincoln Mutual Health Insurance Co. v. United States*, 129 Fed. Cl. 81 (2016) (Lettow, J.).  As the court is aware, the Federal Circuit agreed with the majority of Court of Federal Claims judges that QHP issuers were not entitled to any risk corridors recovery.  *See Moda Health Plan, Inc. v. United States*, 892 F.3d 1311 (Fed. Cir. 2018).  The Federal Circuit ruled that Congress had impliedly repealed the government's obligation to make full risk corridors payments when it passed an appropriations rider prohibiting the Department of Health and Human Services from making the payments out of certain funds.  *Id*. at 1329.  The Federal Circuit's ruling effectively left the *Health Republic* and *Common Ground* cases dead in the water.  But neither this setback nor any of the preceding adverse Court of Federal Claims decisions deterred Quinn Emanuel, which pressed on, devoting substantial time and effort to the initial appeal, petition for *en banc* rehearing, Supreme Court certiorari stage, and Supreme Court merits stage—all on the exceedingly small chance the U.S. Supreme Court would agree to hear the case and reverse the Federal Circuit.  *See supra* § III.A.

Quinn Emanuel's work on the risk corridors matters is thus the epitome of a campaign in which class counsel undertook a significant, ever-increasing commitment to a matter despite low odds of success.  Quinn Emanuel was the first to file suit on behalf of what is undeniably the largest group of risk corridors plaintiffs, regarding an issue with no binding precedent; the government

vehemently opposed the classes' efforts to recover; and Quinn Emanuel aggressively litigated both the *Health Republic*/*Common Ground* cases and parallel cases, even after trial and appellate courts handed risk corridor plaintiffs loss after loss.  This is precisely the context in which the risk of nonrecovery justifies a substantial award of attorneys' fees.  See *Kane Cty.,* 145 Fed. Cl. at 19; *Quimby*, 107 Fed. Cl. at 133; *Moore*, 63 Fed. Cl. at 789.

    **D.**    **Contingency Fees Far in Excess of 5% Are Regularly Negotiated in Similar Cases**

The contingency fee parties have negotiated or would negotiate in a free market is a key factor in assessing the reasonableness of class counsel's fee request.  Silver Dec. ¶ 21-22; Fitzpatrick Dec. ¶ 13.  This is so because using rates determined at the outset of a case avoid the risk that "hindsight alters the perception of the suit's riskiness."  *In re Synthroid Mktg. Litig.*, 264 F.3d 712, 718–19 (7th Cir. 2001).  "Only *ex ante* can bargaining occur in the shadow of the litigation's uncertainty."  *Id*. at 719.  As previously noted, the risk corridors cases carried significant uncertainty at their inception:  there was no case law interpreting Section 1342; the issue of whether a statute is "money-mandating" is not often litigated; and the ultimate strength of the government's defenses (as well as their full scope) was unknown.  *See supra*. Sec. III.C.  Rates negotiated by individual litigants at the outset of other risk corridor cases, and at the outset of commercial litigation more generally, thus provide invaluable guidance to the Court in assessing the reasonableness of class counsel's fee request.  *See also Quimby*, 107 Fed. Cl. at 134 ("A contingent fee that is reached by the free consent of private parties should be respected as fair as between them.").

Quinn Emanuel's 5% fee request is significantly lower than the contingent fees routinely found in both risk corridors litigation and commercial litigation more generally.  Fitzpatrick Dec. ¶¶ 22-23; Silver Dec. ¶¶ 49-67.   "Attorneys regularly contract for contingent fees between 30%

and 40% with their clients in non-class, commercial litigation." *In re Ins. Brokerage Antitrust Litig.*, 282 F.R.D. 92, 123 (D.N.J. 2012); *see also Acevedo v. Brightview Landscapes, LLC*, No. CV 3:13-2529, 2017 WL 4354809, at *19 (M.D. Pa. Oct. 2, 2017) ("Generally, a request of one-third of the settlement fund comports with privately negotiated contingent fees negotiated on the open market.") (internal quotation marks omitted). Consistent with these rates, prior to filing suit, Health Republic and Common Ground both agreed to attorneys' fees of 25% of any gross recovery, whether through a judgment for the class or a class settlement.[2]  Swedlow Dec. ¶ 8; Bonder Dec. ¶ 11; Mahaffey Dec. ¶ 8.  Class counsel is thus requesting a fee one-fifth the size of the fee negotiated with sophisticated parties on the free market.

In the broader universe of risk corridors cases, attorneys for individual QHP issuers have entered into contingency fee arrangements at rates significantly higher than Quinn Emanuel's 5% request.  After Quinn Emanuel filed *Health Republic*, several law firms began canvassing QHP issuers to sign them up as clients, and specifically on a contingent basis.  During the opt in period, class counsel learned that certain QHP issuers who had not spoken to Quinn Emanuel believed that Quinn Emanuel would seek 33% of any settlement or award.  Swedlow Dec. ¶ 13.  Knowing that this was incorrect, Quinn Emanuel issued a supplemental class notice in *Health Republic* indicating that it would seek an attorney's fee of no greater than 5% of the recovery, and repeated that same commitment in each subsequent class notice in both the *Health Republic* and *Common Ground* class actions.  Swedlow Dec. ¶ 15.  Class counsel learned, however, that prior to the issuance of the supplemental class notice, other law firms entered into agreements with QHP issuers on a contingent basis to pursue risk corridors claims at percentages in multiples of the 5%

---

[2]  Class counsel is not seeking a 25% attorneys' fee  from Health Republic or Common Ground; instead, Health Republic and Common Ground will be subject to same fee award approved by the Court for all class members.  Swedlow Dec. ¶ 8.

Quinn Emanuel seeks here. Swedlow Dec. ¶ 14. After the supplemental class notice issued, firms offering contingency fee arrangements were unwilling to match Quinn Emanuel's 5%. Swedlow Dec. ¶ 16. As a consequence, after the supplemental notice, some QHP issuers chose to opt into the class because Quinn Emanuel's offered fee rate was the lowest they were able to obtain. *Id*.

Ultimately, 153 QHP issuers joined the *Health Republic* class and 130 QHP issuers joined the *Common Ground* class, by orders of magnitude the largest contingent of issuers represented any firm. Swedlow Dec. ¶ 17. "Insurers are sophisticated purchasers of legal services," and their behavior can thus "define the market." *Synthroid*, 264 F.3d at 719. In this case, the market's behavior confirms that Quinn Emanuel's 5% cap was an excellent deal, compared to the contingency rates available to QHP issuers at the outset of the risk corridors cases. Silver Decl. ¶ 21 ("Because issuers are sophisticated business entities with easy access to legal services, competition enabled them to choose the option that would serve them best. They having done so, there is no reason to reduce QE's fees below the level that class members deemed to be reasonable when they opted in."). In evaluating their litigation options and deciding to opt-in, QHP issuers "presumably concluded that a better deal could not be reached with their own counsel." *Quimby*, 107 Fed. Cl. at 134 (approving a 30% contingency fee in part because class members' decisions to opt-in suggested that they could not find more favorable terms on the market). This factor weighs heavily in favor of approving class counsel's fee request.[3]

---

[3] Moreover, although not dispositive, the contingency fees typically approved by courts bear upon the rate that would be negotiated by hypothetical private parties in the marketplace "because they may influence the expectations of lawyer and client engaging in the hypothetical negotiation." *In re Trans Union Corp. Privacy Litig.*, No. 00 C 4729, 2009 WL 4799954, at *11 (N.D. Ill. Dec. 9, 2009); *see also Nilsen v. York Cty.*, 400 F. Supp. 2d 266, 282–83 (D. Me. 2005) ("[C]ourts' awards necessarily affect the expectations of lawyers and, therefore, what they might agree to in voluntary negotiation."). As explained in detail in Section III.F, *infra*, Quinn Emanuel's 5% fee request is far below the rates typically approved in common fund litigation, and is also well below the rates

E.      **Class Members Were on Notice of Counsel's Likely Fee Request Before They Opted In**

While it is uncertain as of the date of this petition whether any class members will object to class counsel's fee request, it is important to note the meaningful differences between this case and more run-of-the-mill class actions.  The class members here are not unsophisticated consumers or workers; they are large, sophisticated entities, most of whom have their own in-house counsel or have separate outside counsel through whom they communicated with class counsel.  Fitzpatrick Dec. ¶ 13.  Unlike typical class actions—which bind thousands or potentially millions of individuals (who likely have never heard of the suit) unless they opt out—each of the class members here affirmatively chose to *opt in* to the *Health Republic* and *Common Ground* classes, which meant they affirmatively selected Quinn Emanuel as their counsel amid a competitive marketplace offering numerous other options of highly-qualified counsel, on both contingency and hourly bases.  Swedlow Dec. ¶ 17; Fitzpatrick Dec. ¶¶ 11-13, 21.  And doing so yielded them a 100% recovery amounting to approximately $3.7 billion, an extraordinarily uncommon result. Fitzpatrick Dec. ¶¶ 7, 27.  This case could not be further afield from many class actions implicating the Court's gatekeeping function, where the proposed outcome "results in fees for class counsel but yields no meaningful relief for the class."  *In re Subway Footlong Sandwich Mktg. & Sales Practices Litig.*, 869 F.3d 551, 556 (7th Cir. 2017).

Against this backdrop—hyper-sophisticated class members and a competitive market for counsel—Quinn Emanuel informed QHP issuers that it intended to seek a contingency fee of up to 5% before the issuers opted in to the class.  The class notice in *Common Ground* and the

_____

typically approved in so-called "superfund" cases.  *See Raulerson*, 108 Fed. Cl. at 680 (holding that the market negotiation factor weighed in favor of approving counsel's fee request because "Class Counsels' 33% fee is in line with the rates awarded in similar common fund cases"); *see also* Fitzpatrick Dec. ¶¶ 23-26.

supplemental class notice in *Health Republic* informed putative class members "that [Quinn Emanuel] will request no more than 5% of any judgment or settlement obtained for the QHP Issuer Class." *Health Republic* Dkt. 50-1; *Common Ground* Dkt. 24-1.  When QHP issuers subsequently asked class counsel about attorneys' fees, class counsel informed them that it planned to seek a 5% fee.  Swedlow Dec. ¶ 15.  The class was thus on notice that Quinn Emanuel would likely seek 5% of the judgment, and each and every class member still chose to opt in instead of pursuing a different arrangement with individual counsel (many of which were available to them).  Indeed, numerous QHP issuers received the class notice and decided to retain individual counsel, with multiple QHP issuers informing class counsel that they decided to file individually precisely because they preferred a different fee structure.  Swedlow Dec. ¶ 14.  Highly sophisticated class members made an informed decision to opt in and select Quinn Emanuel as counsel knowing the fee Quinn Emanuel would likely seek, just as QHP issuers who sought a different arrangement hired counsel to proceed individually.  Class members' informed and affirmative decisions to select Quinn Emanuel as counsel amid myriad alternatives strongly favors approval of class counsel's fee request.  *See* Fitzpatrick Dec. ¶ 21; Silver Dec. ¶ 21; *Quimby*, 107 Fed. Cl. at 134 (approving class counsel's fee request in part because "the claim form that each class member executed to opt into the class expressly notified class members that class counsel intended to apply 'for an award of attorney fees of thirty percent of the recovery of each class member, and costs,' which could 'be taken out of the total recovery of the class[.]'"); *Thomas v. United States*, 121 Fed. Cl. 524, 527 (2015), *rev'd in part on other grounds sub nom. Longnecker Prop. v. United States*, No. 2015-5045, 2016 WL 9445914 (Fed. Cir. Nov. 14, 2016) (approving class counsel's fee request in part because "[w]hen each class member opted-in to the litigation, he or she was provided with a court-approved notice stating that, if plaintiffs prevailed or reached a settlement,

class counsel would recover either a contingency fee of 35% of the total recovery or attorneys' fees pursuant to the URA, whichever amount was greater.").

>    **F.**    **The Percentage Sought is Far Less Than in Comparable Cases**

When evaluating the reasonableness of a proposed contingency fee award, this Court considers the percentage awarded in other class actions. *Raulerson*, 108 Fed. Cl. at 680.

If approved, Quinn Emanuel's proposed 5% contingency fee would be among the lowest rates awarded in any case of any size. Fitzpatrick Dec. ¶¶ 23, 26; Silver Dec. ¶¶ 20, 69, 75-77. Courts routinely approve contingency fees of 30-40% because such fee structures are the norm for common fund cases such as this. Fitzpatrick Dec. ¶ 23; Silver Dec. ¶ 49; *Kane County*, 145 Fed. Cl. at 19 (finding "an award equal to one third of the common fund is commensurate with attorney fees awarded in other class action common fund cases"); *Raulerson*, 108 Fed. Cl. at 680 (noting that awards in class actions with common funds "typically range between 20-30% of the fund, with 50% being the upper limit" and finding award of 33% "in line with the rates awarded in similar common fund cases").

This is true even of cases (such as this one) that involve substantial class recoveries; courts routinely award counsel one-third of the relief obtained as fees, even in high-recovery cases. *In re Neurontin Antitrust Litig.*, 2:02-cv-01830, Dkt. 114 (D.N.J. Aug. 6, 2014) (33.33 % fee for $190 million); *In re Skelaxin*, 12-md-2343, Dkt. 747 (E.D. Tenn. June 30, 2014) (33.33% fee for $73 million); *In re Tricor Direct Purchaser Antitrust Litig.*, 05-340-SLR, Dkt. 543 at 8-10 (D. Del. Apr. 23, 2009) (30% fee for $250 million); *In re Relafen Antitrust Litig.*, 01-12239-WHY, Dkt.

297 at 7-8 (D. Mass. 2004) (33.33% fee for $175 million); *La. Wholesale Drug Co., Inc. v. Bristol-Myers Squibb Co.*, 01-cv-7951, Dkt. 22 (S.D.N.Y. Apr. 11, 2003) (33.33% fee for $220 million)[4].

In cases with a recovery as substantial as this one, courts sometimes apply a lower rate. Fitzpatrick Dec. ¶ 26. However, even compared with such cases, Quinn Emanuel's requested 5% fee is at the very lowest end of the spectrum. *See, e.g., In re Southern Peru Copper Corp.*, No. CIV.A. 961-CS, 2011 WL 6382006, at *1 (Del. Ch. Dec. 20, (awarding approximately $304 million in fees and expenses, totaling 15% of the $2 billion judgment); *In re Tyco Int'l, Ltd. Multidistrict Litig.*, 535 F. Supp. 2d 249 (D.N.H. 2007) (awarding $464 million in fees, representing 14.5% of $3.3 billion recovery); *In re NASDAQ Market-Makers Antitrust Litigation*, 187 F.R.D. 465, 488 (S.D.N.Y. 1998) (in case involving recovery in excess of $1 billion, fee of $143,780,000, or 14% of the total fund was reasonable and appropriate); *In re Payment Card Interchange Fee and Merchant Discount Antitrust Litigation*, 991 F. Supp. 2d 437, 445 (E.D.N.Y. 2014) (holding that that requested attorney fee award representing 9.56% of total recovery, or approximately $544.8 million, was fair and reasonable); *In re Enron Corp. Securities, Derivative & ERISA Litigation*, 586 F. Supp. 2d 732 (S.D. Tex. 2008) (holding that that requested attorney fee award representing 9.52% of total recovery, or approximately $688 million, was fair and reasonable; *In re Visa Check/Mastermoney Antitrust Litigation*, 297 F. Supp. 2d 503 (E.D.N.Y. 2003) (approving fees of $220 million, representing 6.511% of the approximately $ 3.4 billion fund).

In one recent case, *In re Payment Card Interchange Fee and Merchant Discount Antitrust Litigation*, 991 F. Supp. 2d 437 (E.D.N.Y. 2014), the Court conducted a survey of so-called

---

[4]   Where not specified in published opinions, Quinn Emanuel has calculated total recovery based on the approved fee award.

"megafund" cases and provided its thoughts on a graduated scale for attorneys' fees.  The scale set

forth in *Interchange Fee* suggested a marginal fee percentage at various levels of recovery; as

recoveries go higher, the marginal fee percentage decreases.  *Id.* at 445.  Using that matrix, which

is set forth below, the *Interchange Fee* Court awarded class counsel $544.8 million in fees out of

a $5.7 billion settlement fund, representing a contingent  fee of 9.56%.

| Bracket | Fee percentage | Marginal fee |
|---|---|---|
| 0–$10 million | 33% | $3.3 million |
| $10 million-$50 million | 30% | $12 million |
| $50 million-$100 million | 25% | $12.5 million |
| $100 million-$500 million | 20% | $80 million |
| $500 million-$1 billion | 15% | $75 million |
| $1 billion-$2 billion | 10% | $100 million |
| $2 billion-$4 billion | 8% | $160 million |
| $4 billion-$5.7 billion | 6% | $102 million |
| TOTALS | (average) 9.56% | $544.8 million |

*Id.*  Applying the *Interchange Fee* Court's framework to this case would result in an 11%

contingency fee.  Nevertheless, Quinn Emanuel requests ***less than half*** that amount.  Accordingly,

this factor also supports Quinn Emanuel's requested award.

### G.   Size of Award

When evaluating the reasonableness of proposed fees, this Court considers the size of the

award relative to the total recovery for the class.  *Raulerson v. United States*, 108 Fed. Cl. 675,

680 (Fed. Cl. 2013).  This factor also favors the requested award.

This is not a class action where the class members will receive little—either as a collective

or as individuals—while counsel is enriched.  Here, class members will receive 100% of their

damages, net of any fees the Court awards Quinn Emanuel.   Individual class members will receive

millions of dollars—in some cases, hundreds of millions of dollars.  Where the class recovery is

so high (particularly on a per-class member basis), courts regularly approve fee awards that are

small in comparison.  *See, e.g., In re Visa Check/Mastermoney Antitrust Litigation*, 297 F. Supp. 2d 503 (E.D.N.Y. 2003) (noting $220 million fee award was "small in comparison" to the $3.3 billion recovery for the class); *In re Southern Peru Copper Corp.*, 2011 WL 6382006, at *1 (awarding approximately $304 million in fees and expenses out of $2 billion judgment); *In re Tyco Int'l, Ltd. Multidistrict Litig.*, 535 F. Supp. 2d 249 (D.N.H. 2007) (awarding $464 million in fees out of $3.3 billion recovery).

### H.    A "Lodestar Cross-Check" Confirms Quinn Emanuel's Requested Fees Are Reasonable

The notice class members received before opting in stated that Quinn Emanuel would seek up to 5% of any judgment in fees "subject to, among other things, the amount at issue in the case and what is called a 'lodestar cross-check.'"  *Health Republic* Dkt. 50-1; *Common Ground* Dkt. 24-1.  Such a cross-check, although not mandatory, confirms that Quinn Emanuel's fee request here is reasonable.

### 1.    A lodestar cross-check is an additional tool used to assess the reasonableness of class counsel fee requests

As an initial matter, a percentage-of-the-fund award based on the factors discussed in the previous sections is the clear preference in a common fund case such as this.  *See, e.g.*, *Quimby v. United States*, 107 Fed. Cl. 126, 132 (2012).  Courts providing such awards, including this one, routinely do so without conducting a "lodestar cross-check."  *Id.*; *Raulerson v. United States*, 108 Fed. Cl. 675, 680–81 (2013); *Lambert v. United States*, 124 Fed. Cl. 675, 683 n.10 (2015) (rejecting the government's argument that a percentage analysis must be supplemented with "a more involved lodestar determination"); *see also Haggart v. Woodley*, 809 F.3d 1336, 1355 (Fed. Cir. 2016) (affirming a district court's discretion to employ either a percentage or lodestar method); 5 Newberg on Class Actions § 15:67 (Rubenstein ed., 5th ed. 2020) (approximately 50% of

common cases do not consider lodestar at all); Fitzpatrick Dec. ¶ 29 (citing studies showing that over half of courts do not employ the lodestar method primarily or as a cross-check).[5]

This is for good reason:  there is widespread recognition that the lodestar approach has a number of negative side effects, including, *inter alia*, "tempting lawyers to run up their hours, and compelling district courts to engage in a gimlet-eyed review of line-item fee audits.'"  *Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 121 (2d Cir. 2005); *see also* 7B Fed. Prac. & Proc. Civ. § 1803.1 (Wright and Miller, 3d ed. 2020).  Opting for a lodestar approach to class counsel fees also ignores that the percentage method is the clear preference "when potential clients and lawyers bargain freely for representation," particularly, as here, for "sophisticated individual clients [with] high-stakes, complex claims worth hundreds of millions of dollars."  *Interchange Fee and Merchant Discount Antitrust Litigation*, 991 F. Supp. 2d 437, 440 (E.D.N.Y. 2014).

For these reasons, a lodestar cross-check is an additional tool courts may use to assess the reasonableness of class counsel's fees, but it is not the primary tool and should not act as an artificial limit on such fees, because mechanically applying it threatens to "bring[] through the backdoor all of the bad things the lodestar method used to bring through the front door."  Fitzpatrick Dec. ¶ 30.  As *Geneva Rock Prods, Inc. v. United States*—which the class notice explicitly cited—confirms:

> [T]he lodestar cross-check provides information for the court's consideration, not a mandate[.]  The lodestar multiplier does not need to fall within a specific range, but a comparison to the lodestar multipliers in similar cases may provide additional guidance to the court.  Nevertheless, '*the lodestar cross-check does not trump the primary reliance on the percentage of common fund method*.'

---

[5]   The "lodestar method" involves calculating the product of attorneys' hourly rate with the number of hours worked (the "lodestar").  *Haggart*, 809 F.3d at 1355.  In common fund cases, courts then "appl[y] a risk multiplier when using the lodestar approach" to properly compensate class counsel for the risk of no or reduced recovery.  *Id.*

119 Fed. Cl. 581, 595-96 (2015) (*rev'd in part on other grounds by Longnecker Prop. v. United States*, No. 2015–5045, 2016 WL 9445914, at *1 (Fed. Cir. Nov. 14, 2016) (emphasis added).

### 2.   Quinn Emanuel's requested fees are within well-accepted ranges for lodestar multipliers for results such as these

The result achieved in this case—a 100% class recovery comprised of a nearly-$3.7B judgment fund, obtained after class counsel took on significant risk and continued to doggedly pursue the classes' interests after several potentially case-ending setbacks—supports a high lodestar multiple.  Throughout many years of work on the *Health Republic* and *Common Ground* cases, Quinn Emanuel attorneys have put in almost 10,000 hours, at a blended hourly rate of approximately $1033 across partners and associates.  Swedlow Dec. ¶ 23.  In addition, Quinn Emanuel's supporting employees, including paralegals, spent over 400 hours on these matters at an average rate of approximately $325 per hour.  Quinn Emanuel's lodestar for the *Health Republic* and *Common Ground* cases, including expenses, is over $10 million at historical rates, which would lead to an approximately 18-19x risk multiplier.[6]  Although this is concededly at the higher end of the spectrum, is not at all unprecedented in a case where the benefit obtained for the class is so high.  While multipliers in the majority of cases tend to be low, "multipliers increase as fund size increases," leading to "a not insignificant set of cases with lodestars that literally fall 'off these charts.'"  5 Newberg § 15:81; *see Americas Mining Corp. v. Theriault*, 51 A.3d 1213, 1252 (Del. 2012) (affirming lodestar multiple of "66 times the value of [the lawyers' time and expenses]", or "$35,000 per hour worked," calculated as 15% of a $2.031 billion fund); *In re Merry-Go-Round*

---

[6] "The lodestar cross-check calculation need entail neither mathematical precision nor bean-counting."  *Id.* (quoting *In re Rite Aid Corp. Secs. Litig.*, 396 F.3d 294, 306 (3rd Cir. 2005); *Kane Cty., Utah v. United States*, 145 Fed. Cl. 15, 20 (2019) (same).  It is therefore appropriate for this court to "rely on summaries submitted by the attorneys," rather than conduct a cumbersome "review actual billing records."  *Rite Aid*, 396 F.3d at 307; *see also Geneva Rock*, 119 Fed. Cl. at 595; *Kane Cty.*, 145 Fed. Cl. at 20.

*Enters., Inc.*, 244 B.R. 327, 335, 345 (D. Md. 2000) (granting fees worth 19.6 times the estimated lodestar, or 40% of a $71.2 million recovery); *Stop & Shop Supermarket Co. v. SmithKline Beecham Corp.*, No. 03-civ-04578, 2005 WL 1213926, at *18 (E.D. Penn. May 19, 2005) (granting fees 15.6 times the estimated lodestar, or 20% of a $100 million settlement fund); *Beckman v. KeyBank, N.A.*, 293 F.R.D. 467, 481 (S.D.N.Y 2013) ("Courts regularly award lodestar multipliers of up to eight times the lodestar, and in some cases, even higher multipliers."). Further, because almost half of all courts in common fund cases do not use a lodestar check *at all*, even as a cross-check, 5 Newberg on Class Actions § 15:67, it is likely that the true number of high or double digit lodestar multiples is vastly underestimated.

These cases track the intuition that class counsel should be rewarded for the risk it takes on and the extent of the recovery it receives for the class. *See* 5 Newberg on Class Actions § 15:87 (citing "the risks counsel took" and "the results they achieved for the class" as the most important factors in assessing "the reasonableness of a lodestar multiplier"); *In re Enron Corp. Secs., Derivative, & Erisa Litig.*, 586 F. Supp. 2d 732, 752 (S.D. Tex. 2008) ("The multiplier represents the risk of the litigation, the complexity of the issues, the contingent nature of the engagement [and] the skill of the attorneys[.]"); *In re WorldCom, Inc. Secs. Litig.*, 388 F. Supp. 2d 319, 359 (S.D.N.Y. 2005) (noting that "public policy" supports a high multiplier where "[t]he size of the recovery achieved for the class . . . could not have been achieved without the unwavering commitment of Lead Counsel to this litigation."). Here, Quinn Emanuel achieved a class recovery that is not merely enormous in absolute terms, but also constitutes a complete recovery of claimed damages in the face of extraordinarily complex issues and a vigorous, determined adversary. The law supports rewarding that extraordinary result with a higher lodestar multiplier, as it incentivizes current and future class counsel to achieve the absolute best results possible. Silver Dec. ¶ 23

("The gross recovery per claimant—100 percent of the risk corridor payments that were due but not made—is exactly what the issuers hoped to secure when they opted into QE's classes. . . . In the private market, clients reward lawyers for winning their cases.  They do not punish them by slashing their fees.").

In comparison, the law firms that convinced QHP issuers to file individual actions on a contingent fee basis will make multiples of the amounts Quinn Emanuel requests here.  Quinn Emanuel could have proceeded in that way and increased the government's burden by filing over 150 separate lawsuits, but it did not.  Instead, it pursued a class action that increased efficiency and allowed all class members to litigate in a much cheaper way.  The fee Quinn Emanuel requests is large because of the number of class members who chose Quinn Emanuel as their counsel, and the strength of the results it obtained for them.  Quinn Emanuel respectfully submits that success— particularly its cost effective and efficient nature—should also be rewarded.

## IV.    THE CLASS REPRESENTATIVES SHOULD RECEIVE INCENTIVE AWARDS

Finally, Quinn Emanuel requests the Court's approval of an $100,000 incentive award for each of Health Republic and Common Ground (the "Class Representatives") for their role as class representatives.   Payment of incentive awards to class representatives is a reasonable use of settlement funds.  *Russell v. United States*, 132 Fed. Cl. 361, 365 (2017).  These awards are meant to help incentivize members of a class to take on the case and pursue the defendants for the greater whole.

Moreover, Quinn Emanuel agrees to deduct the requested incentive award funds from *its* fee award in this matter so that the payment of the requested incentive award will not otherwise diminish the proceeds paid to the class in any way.

When evaluating requests for incentive awards, district courts typically focus on the level of the representatives' involvement, whether or not they are institutional entities (that typically have

greater burdens in litigation than individual/consumer plaintiffs), and the amount of the requested award in comparison to the total amount obtained on behalf of the class.  *See Shane Grp., Inc. v. Blue Cross Blue Shield of Mich.¸* No. 10-CV-14360, 2015 WL 1498888, at *18-19 (E.D. Mich. Mar. 31, 2015) (applying these factors when assessing incentive award request); *In re Prandin Direct Purchaser Antitrust Litig.*, No. 2:10-CV-12141-AC-DAS, 2015 WL 1396473, at *5 (E.D. Mich. Jan. 20, 2015) (same); *In re Payment Card Interchange Fee and Merchant Discount Antitrust Litig.*, No. 1:05-md-01720, Dkt. 6169 (E.D.N.Y. Jan. 10, 2014) (same); *see also In re Vitamin C Antitrust Litig.,* No. 06-MD-1738 BMC JO, 2012 WL 5289514, at *11 (E.D.N.Y. Oct. 23, 2012) (class representative's institutional nature warranted higher incentive award).

For the past four years, the Class Representatives have dutifully represented the Class in all matters related to this action.  The Class Representatives significantly aided counsel with both understanding and prosecuting the case.  *See* Bonder Dec. ¶ 13; Mahaffey Dec.¶ 7.  The Class Representatives—two large institutional entities—also took a large risk in suing the government, a significant payor and key regulator.  *See* Bonder Dec. ¶ 10; Mahaffey Dec.¶ 5.  In all, through Quinn Emanuel and the Class Representatives' coordinated efforts, the Class has obtained full recovery of all sums owed—a judgment of nearly $3.7 billion.  Given all of this, Quinn Emanuel respectfully submits that all factors support the requested $100,000 incentive awards.

## V.    <u>CONCLUSION</u>

For the foregoing reasons, Quinn Emanuel respectfully requests that the Court approve its application for attorneys' fees and costs.  Specifically, Quinn Emanuel requests that the Court approve its application for an attorney's fee of 5% of the net recovery for the Non-Dispute Subclasses in *Health Republic* and *Common Ground*.  In *Health Republic*, this amounts to an attorney's fee of $95,183,102.35 on a net recovery of $1,903,662,047.19; in *Common Ground*, this amounts to an attorney's fee of $89,665,569.32 on a net recovery of $1,793,311,386.47.  Finally,

Quinn Emanuel respectfully requests approval of a class incentive fee of $100,000 to be paid to each of Health Republic and Common Ground, to be taken from class counsel's attorneys' fee award.

Dated: July 30, 2020                          Respectfully submitted,

                                             QUINN EMANUEL URQUHART &
                                             SULLIVAN, LLP

                                             */s/ Stephen Swedlow*
                                             Stephen Swedlow
                                             stephenswedlow@quinnemanuel.com
                                             191 North Wacker Drive
                                             Suite 2700
                                             Chicago, Illinois 60606
                                             Telephone:  (312) 705-7400
                                             Facsimile:  (312) 705-7401

                                             J.D. Horton
                                             jdhorton@quinnemanuel.com
                                             Adam B. Wolfson
                                             adamwolfson@quinnemanuel.com
                                             865 S. Figueroa Street
                                             Los Angeles, California 90017
                                             Telephone:  (213) 443-3000
                                             Facsimile:  (213) 443-3100

                                             *Attorneys for Plaintiff Common Ground*
                                             *Healthcare Cooperative and the Class*